## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

|  |  |
|---|---|
| **JELA JEVREMOVIC,** | ) |
|  | ) |
| **Plaintiff,** | ) |
|  | ) |
| **v.** | ) **Civil Action No. 1:07-CV-01278 (RMU)** |
|  | ) |
|  | ) |
| **MICHAEL CHERTOFF, Director,** | ) |
| **U.S. Department of Homeland Security,** | ) |
|  | ) |
| **and** | ) |
|  | ) |
| **EMILIO GONZALEZ, Director,** | ) |
| **U.S. Citizenship and Immigration Services,** | ) |
|  | ) |
| **and** | ) |
|  | ) |
| **ROBERT S. MUELLER, III, Director,** | ) |
| **Federal Bureau of Investigation,** | ) |
|  | ) |
| **Defendants.** | ) |

_____)

### ALTERNATIVE MOTION FOR SUMMARY JUDGMENT

Defendants have moved that the case be dismissed for lack of subject matter jurisdiction.

See Dkt. Entry 8.  Defendants further move in the alternative that the Court award summary

judgment to Defendants, pursuant to Federal Rule of Civil Procedure 56, if the Court denies

Defendants' motion to dismiss.  A supporting memorandum, statement of material facts, and

proposed order are submitted herewith.

Dated: February 4, 2008                    Respectfully submitted,


                    _____/S/_____
                    JEFFREY A. TAYLOR, D.C. BAR # 498610
                    United States Attorney

_____/S/_____

RUDOLPH CONTRERAS, D.C. BAR # 434122
Assistant United States Attorney.

_____/S/_____

ROBIN M. MERIWEATHER, D.C. Bar. # 490114
Assistant United States Attorney
555 Fourth St., N.W.
Washington, D.C.  20530
Phone: (202) 514-7198
Fax: (202) 514-8780
Robin.Meriweather2@usdoj.gov

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
)
**JELA JEVREMOVIC,**                                    )
                                                        )
       **Plaintiff,**                          )
                                                        )
    **v.**                                      ) **Civil Action No. 1:07-CV-01278 (RMU)**
                                                        )
                                                        )
**MICHAEL CHERTOFF, Director,**                          )
**U.S. Department of Homeland Security,**                )
                                                        )
    **and**                                    )
                                                        )
**EMILIO GONZALEZ, Director,**                           )
**U.S. Citizenship and Immigration Services,**           )
                                                        )
    **and**                                    )
                                                        )
**ROBERT S. MUELLER, III, Director,**                    )
**Federal Bureau of Investigation,**                     )
                                                        )
      **Defendants.**                       )
_____)

### STATEMENT OF MATERIAL FACTS NOT IN DISPUTE AND RESPONSE TO PLAINTIFF'S STATEMENT OF MATERIAL FACTS

      Pursuant to Local Rules 7(h) and 56.1, Defendants hereby submit the following statement of material facts as to which there is no genuine dispute, and hereby respond to Plaintiff's statement of facts.  There are no material facts in dispute that would preclude disposition of this case on the merits by entry of summary judgment.

      **A.**    **Defendants' Statement of Material Facts**

1.      Plaintiff Jela Jevremovic filed an application for naturalization on or about May 11, 2006.  <u>See</u> Declaration of Heidi Bijolle, ¶ 3.

2.      USCIS requested that the FBI conduct background checks in connection with Jevremovic's naturalization application.  Those checks are currently pending.  <u>See</u> Bijolle Decl. ¶¶ 4-6; Declaration of Michael Cannon ¶ 41.

3.      USCIS requires that all appropriate background checks be conducted on applicants for naturalization.  <u>See</u> Bijolle Decl. ¶ 5.

4.      Upon receipt of the results of the FBI background check, and assuming that no adverse information is disclosed, USCIS will schedule Jevremovic for a naturalization interview.  <u>See</u> Bijolle Decl. ¶ 8.

**B.      Defendants' Response to Plaintiff's Statement of Material Facts**

Defendants hereby respond to the statement of facts which appears at pages 3-10 of Plaintiff's Motion for Summary Judgment (Dkt. Entry 19).  To the extent that the following response reveals factual disputes between the parties, those disputes are not material; the only facts necessary for resolution of this case are those set forth in Defendants' statement of material facts.

1.      Defendants admit that: (1) Plaintiff filed her mandamus petition on July 18, 2007; (2) Plaintiff's background checks remained pending as of that date; and (3) Plaintiff's naturalization interview had not been scheduled as of that date. Defendants lack knowledge sufficient to form a belief as to the truth of the remaining factual allegations in Paragraph 1, but are willing to assume that they are true for the purposes of this motion.

2.      Defendants deny that Plaintiff has complied with the legal and administrative requirements for naturalization.  <u>See</u> Declaration of Heidi Bijolle, ¶¶ 4, 8; Petition

2

¶ 8 (admitting that Plaintiff has not attended an interview at which USCIS will evaluate her eligibility for naturalization).  The remaining allegations in Paragraph 2 are legal conclusions, to which no response is required, and which Defendants deny.

3.    The allegations in Paragraph 3 are legal conclusions, to which no response is required, and which Defendants deny.

4.    The allegations in Paragraph 4 are legal conclusions, to which no response is required, and which Defendants deny.

5.    Defendants lack knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 5, and therefore deny them.

6.    Defendants lack knowledge sufficient to form a belief as to the truth of Plaintiff's statements regarding what she has been informed of and/or "believes," but are willing to assume that they are true for purposes of this motion.  Defendants further respond that in 2002, heightened national security concerns prompted a review of the former Immigration and Naturalization Service's procedures for investigating the background of individuals seeking immigration benefits, and that it was determined that deeper, more detailed clearance procedures were required to protect the people and the interests of the United States effectively. See Declaration of Michael ¶ 23 (Exh. 3) ("Cannon Decl. ").

7.    The allegations in Paragraph 7 are legal conclusions, to which no response is required, and which Defendants deny.

8.    Defendants deny Plaintiff's allegation that USCIS "expanded the FBI name check

3

in November 2002," but admit that the name check process was reviewed at that time and that it was determined that the name checks should be more thorough. <u>See</u> Cannon Decl. ¶ 23. The remaining allegations in Paragraph 8 are legal conclusions, to which no response is required, and which Defendants deny.

9.      The allegations in Paragraph 9 are legal conclusions, to which no response is required, and which Defendants deny.

10.     Defendants lack knowledge sufficient to form a belief as to the truth of Plaintiff's statements regarding what she has been informed of and/or "believes," but are willing to assume them to be true for the purpose of this motion. Defendants dispute Plaintiff's characterization of the files searched as "non-criminal." <u>See</u> Cannon Decl. ¶ 5 (explaining that the records in CRS are acquired in connection with the FBI's law enforcement responsibilities). Defendants do not dispute the remaining allegations in Paragraph 10. Defendants further respond that a full description of the FBI's name check process is set forth in the declaration of Michael Cannon.

11.     Defendants lack knowledge sufficient to form a belief as to the truth of Plaintiff's statements regarding what she has been informed of and/or "believes," but are willing to assume that they are true for purposes of this motion. Defendants do not dispute the remaining allegations in Paragraph 11. Defendants further respond that a full description of the FBI's name check process is set forth in the declaration of Michael Cannon

12.     Defendants lack knowledge sufficient to form a belief as to the truth of Plaintiff's

statements regarding what she has been informed of and/or "believes," but are willing to assume that they are true for purposes of this motion. Defendants do not dispute the remaining allegations of Paragraph 12. Defendants further respond that a full description of the FBI's name check process is set forth in the declaration of Michael Cannon.

13.     Defendants lack knowledge sufficient to form a belief as to the truth of Plaintiff's statements regarding what she has been informed of and/or "believes," but are willing to assume that they are true for purposes of this motion. Defendants admit that USCIS will not complete its adjudication of a naturalization application until it receives the result of a completed name check. Defendants further respond that in 1997 Congress mandated that USCIS "receiv[e] confirmation from the Federal Bureau of Investigation ("FBI") that a full criminal background check has been completed" prior to adjudication of a naturalization application. See Pub. L. No. 105-119, 111 Stat. 2448 (1997).

14.     Defendants lack knowledge sufficient to form a belief as to the truth of Plaintiff's statements regarding what she has been informed of and/or "believes," but are willing to assume that they are true for purposes of this motion. Defendants do not dispute the allegations of Paragraph 14.

15.     Defendants lack knowledge sufficient to form a belief as to the truth of Plaintiff's statements regarding what she has been informed of and/or "believes," but are willing to assume that they are true for purposes of this motion. Defendants do not dispute the allegations of Paragraph 15. Defendants further respond that,

5

subject to the limitations imposed by the FBI, USCIS requests expedited name checks for applicants who meet the criteria for having their name checks expedited.

16. Defendants lack knowledge sufficient to form a belief as to the truth of Plaintiff's statements regarding what she has been informed of and/or "believes," but are willing to assume that they are true for purposes of this motion. Defendants deny that USCIS implemented a new policy in 2006 solely in response to litigation. See Fed. R. 12979 (1998) (announcing interim rule concerning interviews and background checks). Defendants further respond that the regulations requiring that naturalization interviews be scheduled only after USCIS receives the results of the applicant's background checks are set forth at 8 C.F.R. § 335.2(b), and that an interim rule to that effect was published in the Federal Register on March 17, 1998. See 63 Fed. R. 12979 (1998). Defendants note that Plaintiff's allegation that USCIS's compliance with that regulation constitutes unreasonable delay states a legal conclusion, and deny that there has been any unreasonable delay.

17. Defendants admit that name checks delay the adjudication of some applications for immigration benefits. Defendants admit that deny that the reports of the USCIS Ombudsman, who is not responsible for adjudicating naturalization applications or any application, are available online, but deny that the reports can be found at http://www.dhs.gov/cisoombudsman. See http://www.dhs.gov/xlibrary/assets/CISOmbudsman_AnnualReport_2006.pdf Defendants do not dispute the remaining allegations of Paragraph 17. Defendants

further respond that the Ombudsman is not a part of USCIS, and instead reports to the Secretary of the Department of Homeland Security.  See 5 U.S.C. § 452.

18.    Defendants admit that the Ombudsman made the statements quoted in Paragraph 18.

19.    Defendants admit that the Ombudsman made the statements quoted in Paragraph 19.

20.    Defendants admit that the Ombudsman made the statements quoted in Paragraph 20.  Defendants deny Plaintiff's allegation that name checks are of limited use or value.  See Cannon Decl.; USCIS Fact Sheet (Exh. 2).

21.    Defendants lack knowledge sufficient to form a belief as to the truth of the allegations of Paragraph 21, but are willing to assume that they are true for the purpose of this motion.

22.    Defendants admit that the Ombudsman made the statements quoted in the first sentence of Paragraph 22.  Defendants deny the remaining allegations of Paragraph 22.  See USCIS Fact Sheet at 1(Exh. 2).

23.    Defendants admit that the Ombudsman made the statements quoted in Paragraph 23.

Dated: February 4, 2008                    Respectfully submitted,

_____/s/_____
JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney


_____/s/_____
RUDOLPH CONTRERAS, D.C. BAR # 434122
Assistant United States Attorney.

_____/s/ Robin M. Meriweather_____
ROBIN M. MERIWEATHER, D.C. Bar. # 490114
Assistant United States Attorney
555 Fourth St., N.W.
Washington, D.C.  20530
Phone: (202) 514-7198
Fax: (202) 514-8780
Robin.Meriweather2@usdoj.gov

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                        )
JELA JEVREMOVIC,                        )
                                        )
            Plaintiff,                  )
                                        )
      v.                                ) Civil Action No. 1:07-CV-01278 (RMU)
                                        )
                                        )
MICHAEL CHERTOFF, Director,             )
U.S. Department of Homeland Security,   )
                                        )
      and                               )
                                        )
EMILIO GONZALEZ, Director,              )
U.S. Citizenship and Immigration Services, )
                                        )
      and                               )
                                        )
ROBERT S. MUELLER, III, Director,       )
Federal Bureau of Investigation,        )
                                        )
            Defendants.                 )
_____)

**MEMORANDUM IN SUPPORT OF DEFENDANTS' ALTERNATIVE MOTION FOR
SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT**

**INTRODUCTION AND SUMMARY**

Plaintiff submitted a naturalization application May 11, 2006, and seeks an order from

this Court compelling Defendant United States Citizenship and Immigration Services ("USCIS")

to complete its adjudication of that application within thirty days, and to approve the application.

See Plaintiff's Mot. for Summary Judgment at 12 (Dkt. Entry 19) ("Pl. MSJ"); Petition for

Mandamus at Prayer for Relief (Dkt. Entry 1) ("Petition").  In accordance with its regulations,

USCIS has not yet scheduled Plaintiff's interview, because her name checks are not complete.

See Petition ¶ 16; 8 C.F.R. § 335.2(b).  Although the mandamus petition only seeks an order

compelling the adjudication of Plaintiff's naturalization application, Plaintiff's motion for summary judgment also requests that the Court compel the FBI to complete its name checks within 30 days.  See Pl. MSJ at 12.

As Defendants explained in their motion to dismiss, the Court lacks jurisdiction to review the claims raised in the mandamus petition.  Pursuant to the Immigration and Naturalization Act ("INA"), federal district courts are authorized to review USCIS's adjudication of a naturalization application if 120 days have passed since the applicant was "examined."  See Defendants' Motion to Dismiss at 3 (Dkt. Entry 8) ("Def. MTD"); 8 U.S.C. § 1447(b).  Plaintiff has not been "examined," because her interview has not taken place.  See, e.g., Al Gadi Gadi v. Chertoff, 2007 WL 1140825 (E.D. Cal. Apr. 17, 2007); Badier v. Gonzales, 475 F. Supp. 2d 1294, 1297-98 (N.D. Ga. 2006); Yan v. Mueller, 2007 WL 1521732, at *6 (S.D. Tex. May 24, 2007).  The Mandamus Act and the Administrative Procedure Act do not provide an alternative source of jurisdiction, as the INA clearly reflects Congress's intent that district court jurisdiction be limited to cases in which 120 days have passed since the applicant's examination.  See Def. MTD at 3-6; United States v. Fausto, 484 U.S. 439, 448-49 (1988) (general grants of jurisdiction cannot be relied upon in the face of a specific statute that confers and conditions jurisdiction).  Moreover, there is no mandamus or APA jurisdiction because USCIS has no nondiscretionary duty to adjudicate a naturalization before an applicant has been examined.  See id.; Norton v. Southern Utah Wilderness Alliance, 524 U.S. 55, 63 (2004) (explaining that courts can only compel agency action that is "legally required").

If the Court were to find that it does have jurisdiction, Defendants would be entitled to judgment as a matter of law.  Plaintiff's claims fail under both the Mandamus Act and the

2

Administrative Procedure Act because USCIS has no statutory or regulatory duty to complete its adjudication of a naturalization application before it receives the results of the FBI's background investigation. To the contrary, both the INA and USCIS regulations expressly preclude USCIS from doing so. USCIS regulations also require that USCIS await the results of that background investigation prior to scheduling Plaintiff's citizenship interview. Likewise, no law requires the FBI to complete immigration-related background investigations within a fixed period of time, or otherwise limits the FBI's discretion over its investigations and the name check process.

Even if Defendants had the type of nondiscretionary duty to act that would give rise to a mandamus or unreasonable delay claim, the facts of this case would not warrant judicial intervention in the naturalization process or the FBI's background investigation. All six of the factors courts in this Circuit consider when reviewing claims that allege unreasonable agency delay favor Defendants. Accordingly, the Court should defer to USCIS's judgments concerning the timing of naturalization interviews and other aspects of its adjudication, and respect the FBI's judgments concerning how to allocate the resources available to process background checks. Prioritizing Plaintiff's application over others which have been pending for even longer would not serve the interests of the agencies or other applicants. It would only reduce the resources available to process other applications and background checks, moving other individuals' applications and background checks farther back in the queue.

## BACKGROUND

### A.    Statutory and Regulatory Framework

Prior to 1990, federal district courts sat as naturalization courts and were vested with

exclusive jurisdiction to review an applicant's eligibility for naturalization and to naturalize

aliens as citizens of the United States.  In 1990, Congress enacted the Immigration Act of 1990,

which overhauled the naturalization process.  See Pub. L. No. 101-649, § 401, 104 Stat. 4978

(1990).  That statute transferred the power to naturalize from the district courts to the Attorney

General, giving the Attorney General  — and now the Secretary of the Department of Homeland

Security — "sole authority to naturalize persons as citizens fo the United States." 8 U.S.C.

§ 1421(a).  If USCIS denies a naturalization application, the applicant may seek administrative

review of that denial, and subsequently may seek de novo review of her/his eligibility in a

federal district court.  See id. §§ 1447(a); 1421(c); 8 C.F.R. § 336.2(b).

Before USCIS can adjudicate a naturalization application, a full background investigation

of the applicant must be completed.  In 1997, Congress mandated that the former INS "receiv[e]

confirmation from the Federal Bureau of Investigation ("FBI") that a full criminal background

check has been completed" prior to adjudication of naturalization applications.  Pub. L. No. 105-

119, 111 Stat. 2448 (Nov. 26, 1997).  Consistent with that mandate, the relevant statutory and

regulatory provisions require the Executive Branch to thoroughly investigate the background of

every applicant for citizenship in order to determine whether that applicant is eligible to be

naturalized.  See 8 U.S.C. § 1446(a); 8 C.F.R. § 335.1.

To be eligible for naturalization, an applicant must demonstrate, inter alia, that "she has

been a person of good moral character. . . for a period of not less than five years immediately

4

preceding the date of filing an application for naturalization." 8 U.S.C. § 1435(b).  The results of a background check are an important means of appraising an alien's moral character.  USCIS conducts several forms of security and background checks to ensure that citizenship applicants are not a risk to national security or public safety.  See Declaration of Heidi Bijolle, ¶ 5 (Exh. 1 hereto).  Those security investigations often reveal significant derogatory information pertaining to applicants for immigration benefits, which may result in the alien being found ineligible for naturalization and  other benefits.  See USCIS Fact Sheet, Immigration Security Checks (Exh. 2 hereto).

During the adjudication process, USCIS also conducts an interview of naturalization applicants.  See 8 U.S.C. § 1446(b); 8 C.F.R. § 335.2(a).  That interview can occur "only after the Service has received a definitive response from the Federal Bureau of Investigation that a full criminal background check of an applicant has been completed."  8 C.F.R. § 335.2 (b).  USCIS notifies applicants to appear for that initial examination after it receives the results of the FBI's background check.  See id.

### B.    Plaintiff's Application

Plaintiff filed a naturalization application on or about May 11, 2006.  See Bijolle Decl. ¶ 3.  USCIS requested that the FBI perform name checks on May 22, 2006, and those name checks remain pending.  See id. ¶ 6; Declaration of Michael A. Cannon, ¶ 41 (Exh. 3 hereto). In accordance with its regulations, USCIS will schedule Plaintiff's naturalization interview upon receipt of the results of the name check results from the FBI.  See Bijolle Decl. ¶ 8.

**STANDARD OF REVIEW**

Under Rule 56, summary judgment is required when the pleadings and evidence demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Diamond v. Atwood, 43 F.3d 1538, 1540 (D.C. Cir. 1995).   A genuine issue of material fact is one that would change the outcome of the litigation.  See Anderson v. Liberty Lobby, Inc, 477 U.S. 242, 243 (1986).  While all evidence and the inferences drawn therefrom must be considered in the light most favorable to the nonmoving party, see Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), summary judgment should be granted if the moving party submits "affirmative evidence that negates an essential element of the nonmoving party's claim" or demonstrates "that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim."  Celotex, 477 U.S at 331.  The nonmoving party has the burden of establishing more than the "mere existence of a scintilla of evidence" demonstrating a genuine issue in dispute for purposes of defeating the moving party's motion. See Lester v. Natsios, 290 F. Supp.2d 11, 19-20 (D. D.C. 2003), citing Anderson v. Liberty Lobby, Inc., 477 U.S. at 255.  "[M]atters of law rather than of fact" may be presented for summary judgment.  Douglas v. First Nat'l Realty Corp., 437 F.2d 666, 669 (D.C. Cir. 1970).

**ARGUMENT**

**I.     PLAINTIFF CANNOT ESTABLISH MANDAMUS JURISDICTION OR A *PRIMA FACIE* CASE FOR MANDAMUS RELIEF.**

A petition for a writ of mandamus is an extraordinary remedy that can be applied only in exceptional circumstances.  To meet the mandamus standard, there must be: 1) a clear right to relief; 2) a plainly defined and nondiscretionary duty on the part of the defendant; and 3) no

other adequate remedy available.  In re Medicare Reimbursement Litigation, 414 F.3d 7, 10 (D.C. Cir. 2005); see also Heckler v. Ringer, 466 U.S. 602, 616 (1984); Ganem v. Heckler, 746 F.2d. 844, 852 (D.C. Cir. 1984) (citing United States ex rel. Girard Trust Co. v. Helvering, 301 U.S. 540, 543 (1937)); Whittle v. Moschella, 756 F. Supp. 589, 596 (D. D.C. 1991).  The Court's decision whether or not to exercise mandamus jurisdiction is discretionary.  Public Citizen v. Kantor, 864 F. Supp. 208 (D.D.C.1994).

As explained in Defendants' motion to dismiss, Plaintiff cannot establish mandamus jurisdiction or state a claim for mandamus relief.  See Def. MTD.  Although courts have jurisdiction to review USCIS's adjudication of a naturalization when more than 120 days have passed since the applicant was "examined," Congress has placed no other limitations upon the timing of USCIS's adjudication.  USCIS regulations require that the applicant's interview be scheduled after the FBI's security investigation and name checks are complete.  See 8 C.F.R. § 335.2(b).   Plaintiff's name checks remain pending.  Thus she has no clear right to have USCIS complete its adjudication of her naturalization application.  Moreover, for the reasons discussed infra, agency action has not been unreasonably delayed in this case.  See Part III, infra.   It follows that Plaintiff has no clear right to relief, and the Court should dismiss the complaint or enter summary judgment for Defendants.

II.   **PLAINTIFF'S REQUEST FOR AN ORDER COMPELLING THE FBI TO COMPLETE ITS NAME CHECKS WITHIN 30 DAYS GOES BEYOND THE SCOPE OF THE MANDAMUS PETITION AND SEEKS RELIEF THE COURT LACKS JURISDICTION TO GRANT.**

Plaintiff's request for an order compelling the FBI to complete its name checks within 30 days is not properly before the Court. Although the mandamus petition names the FBI as a Defendant, the prayer for relief does not ask the Court to order the FBI to complete the name checks, and instead focuses exclusively on the "adjudication" of Plaintiff's naturalization application.[1] See Petition at Prayer for Relief. Plaintiff cannot raise a new claim in a motion for summary judgment, and instead can only seek relief on claims presented in the complaint (which was styled as a petition for mandamus in this case). See Sharp v. Rosa Mexicano D.C., LLC, 496 F. Supp. 2d 93, 97 n. 3 (D.D.C. 2007) (holding plaintiff could not raise new claims in a summary judgment brief); Kilpatrick v. Paige, 193 F. Supp. 2d 145, 148 (D.D.C. 2002) (deeming new claim "invalid" because it was not raised in the complaint or included in a motion to amend the complaint).

If the request for mandamus relief against the FBI had been properly pled, the Court would lack subject matter jurisdiction to review it. The D.C. Circuit has recognized that "[w]hen it comes to matters touching on national security or foreign affairs . . . the presumption of review runs aground." Bruno v. Albright, 157 F.3d 1153, 1162 (D.C. Cir. 1999) (dismissing challenge to denial of visa for lack of jurisdiction); see generally Voinche v. FBI, 940 F. Supp. 323, 328 (D.D.C. 1996) (noting that "courts generally have deferred to agency expertise in national security matters") (citing Miller v. Casey, 730 F.2d 773, 776 (D.C. Cir. 1984)). Although the

---

[1]   The FBI does not adjudicate naturalization applications. See Cannon Decl. ¶ 40.

D.C. Circuit made that statement in connection with a visa application, the same principles apply here.

Name checks are a means of determining whether an individual poses a threat to national security. The name check process determines, <u>inter alia</u>, whether the applicant's identifying information (<u>i.e.</u>, name, social security number, or date of birth) matches that of an individual whose name has been recorded in the FBI's databases in connection with an FBI investigation. <u>See</u> Cannon Decl. ¶ 11. Thus, if an applicant is a suspected criminal and/or terrorist, or a known associate of such a person, the name check process should reveal that information. When conducting its name checks, the FBI reviews records in its Central Records System ("CRS"), which contains the FBI's investigative files. <u>See id.</u> ¶ 4.

Given the obvious national security implications, and the traditional privileges governing law enforcement activities, there is a heavy presumption against judicial review of the pace and thoroughness of the FBI's name check process, or other FBI investigations. <u>See</u> <u>Bruno</u>, 157 F.3d at 1162. That presumption <u>against</u> judicial review, when paired with the fact that neither the Mandamus Act nor the Administrative Procedure Act permits judicial review of discretionary agency actions, compels the conclusion that this Court lacks jurisdiction to review Plaintiff's challenge to the pace of the FBI's name checks.

### A.    The Name Check Process Is Discretionary and Outside the Scope of APA Review.

Although the APA is not an independent source of subject matter jurisdiction, it operates in tandem with federal question jurisdiction under 28 U.S.C. § 1331 to permit courts to review challenges to certain agency actions. <u>See</u> <u>Califano v. Sanders</u>, 430 U.S. 99, 107 (1977); <u>Galluci v. Chao</u>, 374 F. Supp. 2d 121, 128 (D.D.C. 2005); <u>Orlov v. Howard</u>, 523 F. Supp. 2d 30, 37

(D.D.C. 2007) (explaining that district courts have jurisdiction to review APA claims that are not "wholly insubstantial and frivolous").  An agency's alleged failure to act is "sometimes remediable under the APA, but not always." Norton, 542 U.S. at 55.  The APA expressly precludes judicial review of agency actions when "agency action is committed to agency discretion by law."  5 U.S.C. § 701(a)(2); Brock v. Pierce County, 476 U.S. 253, 260 n.7 (1986).  That limitation prevents Plaintiff from using the APA as a means of challenging the FBI's processing of her name check.

Congress has given the FBI complete discretion to conduct its immigration-related name checks, and that discretion necessarily includes decisions regarding how and when to conduct those investigations.  See Pub. Law 101-515, 104 Stat. 2101, 2112 (1990) (providing that the FBI "may" establish and collect fees to process name checks for certain non-criminal justice, non-law enforcement purposes, but imposing no deadlines or other limits on the FBI's discretion).  The FBI has determined that "its mission on homeland security requires that its name check process be primarily focused on providing accurate and thorough results." Cannon Decl. ¶ 20.  That thoroughness and accuracy cannot be sacrificed for speed.  See id.

Plaintiff has identified no statute or regulation imposing any constraints on the FBI's discretion over the name checks it conducts in connection with immigration applications, and Defendants are aware of none.  For example, no statutes or regulations force the FBI to limit its background examinations to a fixed period of time.  See Safadi v. Howard, 466 F. Supp. 2d 696, 700 (S.D.N.Y. 2006); Shalabi v. Gonzales, No. 06-866, 2006 WL 3032413, at * 5 (E.D. Mo. Oct. 23, 2006) (denying plaintiff's request that the court compel that plaintiff's name check be expedited); Hu v. Chertoff, No. Civ. S-06-2805-WBS-EFB, 2007 WL 1515067, at *6 (E.D. Cal.

May 22, 2007) ("[T]here are no governing statutes or regulations specifying a time limit for processing an [legal permanent resident] application or completing a FBI name check."); Tan v. Chertoff, Civ. No. 04:07-236-HEA, 2007 WL 1880742, at *3 (E.D. Mo. June 29, 2007). Thus, courts have recognized that they lack jurisdiction to dictate the terms of FBI background investigations, under the APA or any other statute. See, e.g., Omar v. Mueller, 501 F. Supp. 2d 636, 640 (D.N.J. 2007) (finding no APA jurisdiction to review 'unreasonable delay' claim concerning FBI's completion of name check for naturalization applicant); Konchitsky v. Chertoff, No. Civ. 07-00294-RMW, 2007 WL 2070325, at *6 (N.D. Cal. July 13, 2007) (noting that "courts squarely addressing the issue of whether they have jurisdiction to compel the FBI to perform name checks in connection with adjustment of status petitions have overwhelmingly concluded that they do not"); Shalabi, 2006 WL 3032413, at *5 (concluding court lacked jurisdiction to compel FBI to complete name checks); Sozanski v. Chertoff, 2006 WL 4516968, at *1 (N.D. Tex. Dec. 11, 2006) (finding no APA or Mandamus Act jurisdiction to compel FBI to complete name check).

**B.     There is No Mandamus Jurisdiction For Similar Reasons.**

The discretionary nature of the FBI's name check process also precludes Mandamus Act jurisdiction. As explained supra, the Mandamus Act applies only when the agency has a "clear, nondiscretionary" duty to act, and the plaintiff has a "clear right to relief." See Orlov, 523 F. Supp. 2d at 37-38. Plaintiff can point to no clear and indisputable right to have the name checks completed within a specific time frame, and the FBI has no statutory or regulatory duty to limit background examinations to a fixed period of time. Thus, the Mandamus Act does not confer jurisdiction to review the pace or any other aspect of the FBI's name check investigations. See

11

Sozanski, 2006 WL 4516968, at *1; see generally Orlov, 530 F. Supp. 2d at 38 (finding plaintiff

not entitled to mandamus relief concerning pace of adjudication of adjustment of status

application because he had no clear right to have the application processed more quickly).

### III.    USCIS'S ADJUDICATION OF PLAINTIFF'S NATURALIZATION APPLICATION AND THE FBI'S PROCESSING OF THE NAME CHECK ARE PROCEEDING AT A REASONABLE PACE.

Agencies are "entitled to considerable deference in establishing a timetable for

completing [their] proceedings." Cutler v. Hayes, 818 F.2d 879, 896 (D.C. Cir. 1987).  As the

D.C. Circuit has made clear, the issuance of equitable relief under APA section 706 "is an

extraordinary remedy" and requires "extraordinary circumstances to be present before [courts]

will interfere with an ongoing agency process."  In re: United Mine Workers of America Int'l

Union, 190 F.3d 545, 549 (D.C. Cir. 1999).  Specifically, section 706(1) claims "can proceed

only where a plaintiff asserts that an agency failed to take a discrete agency action that it is

required to take."  Norton, 542 U.S. at 64.  Accordingly, a finding of unreasonable delay is

appropriate only upon a showing "that the agency has a duty to act and that it has 'unreasonably

delayed' in discharging that duty."  In re American Rivers and Idaho Rivers United, 372 F.3d

413, 418 (D.C. Cir. 2004) (quoting (5 U.S.C. § 706(1)); 5 U.S.C. § 555(b); In re Bluewater

Network, 234 F.3d 1305, 1315 (D.C. Cir. 2000).  Moreover, the Court must find that the delay is

"egregious," Cobell v. Norton, 240 F.3d 1081, 1095 (D.C. Cir. 2001), and even then a court

should order an agency to complete its consideration of an issue only in "the exceptionally rare

cases."  In re Barr Labs Inc., 930 F.2d 72, 76 (D.C. Cir. 1991).

Even "a finding that delay is unreasonable does not, alone, justify judicial intervention."

Cobell, 240 F.3d at 1096 (quoting Barr Labs., 930 F.2d at 75).  These principles arise out of

courts' recognition that an administrative agency is entitled to substantial deference in establishing a timetable for completing administrative action, and that the Court should properly be hesitant to upset an agency's priorities by ordering it to expedite one specific action, and thus give it precedence over others.  See Sierra Club v. Thomas, 828 F.2d 783, 794, 797 (D.C. Cir. 1987).  As such, "respect for the autonomy and comparative institutional advantage of the executive branch has traditionally made courts slow to assume command over an agency's choice of priorities."  In re Barr Labs., 930 F.2d at 74.

Consistent with these principles, the D.C. Circuit has identified six factors courts should consider when reviewing claims that allege unreasonable agency delay:

> (1) the time agencies take to make decisions must be governed by a "rule of reason"; (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason; (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake; (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority; (5) the court should also take into account the nature and extent of the interests prejudiced by delay; and (6) the court need not "find any impropriety lurking behind agency lassitude in order to hold that agency action is 'unreasonably delayed.'"

In re United Mine Workers of America Inter. Union, 190 F.3d at 547 (quoting Telecommunications Research & Action Ctr. v. FCC, 750 F.2d 70, 75-77, 79 (D.C. Cir. 1984) ("TRAC").  Significantly, under D.C. Circuit precedent, courts should not "grant relief, even when all the other factors considered in TRAC favored it, where a judicial order putting the petitioner at the head of the queue would simply move all others back one space and produce no net gain."  Mashpee Wampanoag Tribal Council, Inc. v. Norton, 336 F.3d 1094, 1100 (D.C. Cir. 2003) (citing In re Barr Labs., Inc., 930 F.2d 72, 75 (D.C. Cir. 1991)).

13

**A.    Defendants Have No Legal Obligation to Perform the Actions Plaintiff Seeks to Compel.**

The Court need not conduct the full <u>TRAC</u> analysis, because Plaintiff's claims cannot clear the threshold inquiry into whether Defendants are "required to take" the actions Plaintiff seeks to compel.  "The only agency action that can be compelled under the APA is action legally required."  <u>Norton</u>, 542 U.S. at 63.  Congress has directed USCIS to conduct name checks on all applicants for naturalization.  <u>See</u> 8 U.S.C. § 1446(a).  Further, no naturalization application can be granted prior to the examination of the applicant.  <u>See</u> 8 U.S.C. § 1446(b).  As noted <u>supra</u>, USCIS regulations preclude it from interviewing Plaintiff before it has received the results of those name checks; thus Plaintiff has not yet been "examined."  <u>See</u> 8 C.F.R. § 335.2(b). Yet Plaintiff acknowledges that the name checks are not yet complete.  Thus Plaintiff's request that the Court direct USCIS to adjudicate and approve her naturalization application within thirty days seeks to compel USCIS to undertake agency action that is legally <u>forbidden</u>.  In light of the binding regulations, and Congress's imposition of a name check and examination requirement, Defendants' decision to await the results of those name checks prior to scheduling an interview and completing her adjudication of Plaintiff's naturalization application is *a fortiori* reasonable as a matter of law.  <u>See generally</u> <u>Norton</u>, 524 U.S. at 64 (noting that "a delay cannot be unreasonable with respect to action that is not required"); <u>Clouser v. Espy</u>, 42 F.3d 1522, 1536 (9th Cir. 1994) (concluding that agency's policy of refusing to approve certain requests until claims had been validated did not amount to "unlawfully withheld or unreasonably delayed" agency action because it was consistent with the governing statutes).

The summary judgment motion's request for an order compelling the FBI to complete its name checks goes beyond the scope of the petition, and seeks relief that this Court lacks

jurisdiction to award.  See Part II, supra.  However, if the Court were to reach the merits of that

claim, there would be no basis to find that the FBI unreasonably delayed its completion of the

name check.  The FBI has complete discretion to establish the terms on which it conducts its

immigration-related background investigations.  There are no laws requiring the FBI to complete

the name check within a specified period.  That makes perfect sense, as a limit on the length of

an FBI investigation necessarily would limit the scope and thoroughness of the investigation.

Accordingly, the FBI has no "legal obligation" to complete the name check within thirty days,

and the APA cannot be used to compel the FBI to do so.  Norton, 542 U.S. at 64.

### B.    Defendants' Actions Are Reasonable When Evaluated By Reference to a "Rule of Reason."

Defendants' alleged delay in completing the adjudication of Plaintiff's naturalization

application and the related security investigation and name check does not warrant judicial

intervention.  As to the first two factors of the TRAC test, Congress has provided no mandatory

statutory timetable for USCIS to adjudicate naturalization applications under the INA, although

it has authorized courts to review and potentially adjudicate naturalization applications when

more than 120 days have passed since the applicant's examination.  See 8 U.S.C. § 1447(b).

There are no federal statutes limiting the FBI's discretion to set the pace at which its security

investigations and name checks can be completed.  Therefore, under TRAC, in evaluating

whether agency delay constitutes an abuse of discretion, the Court must apply a "rule of reason"

analysis.  See TRAC, 750 F.2d at 80.  Such an analysis "turns on the facts of each particular

case."  Midwest Gas Users Ass'n v. FERC, 833 F.2d 341, 359 (D.C. Cir. 1988).

Plaintiff focuses on the amount of time that has passed since her application was filed

(approximately twenty months).  See Pl. MSJ.  However, "this Circuit [has] made clear that

measuring the delay by years alone cannot establish unreasonable delay." <u>Liberty Fund, Inc. v. Chao</u>, 394 F. Supp. 2d 105, 115 (D.D.C. 2005); <u>see</u> <u>Mashpee Wampanoag Tribal Council, Inc.</u>, 336 F.3d at 430 (reasonableness "cannot be decided in the abstract, by reference to some number of months or years beyond which agency inaction is presumed to be unlawful").   Instead, the relevant factors include "the complexity of the task at hand, the significance (and permanence) of the outcome, <u>and the resources available to the agency</u>." <u>Mashpee Wampanoag Tribal Council, Inc.</u>, 336 F.3d at 430 (emphasis added).  Moreover where, as here, Congress has declined to mandate a specific timetable for agency action, the Court is "not free to ignore that judgment and rewrite the statute to include a specific timetable." <u>In re American Fed. of Govt. Employees AFL-CIO</u>, 837 F.2d 503, 506 (D.C. Cir. 1988).

       In this case, Defendants' actions survive review under a "rule of reason" standard. Although Plaintiff is concerned only with her own application and security investigation, the heavy volume of similar applications that Defendants have before them cannot be ignored. <u>See</u> <u>Espin v. Gantner</u>, 381 F. Supp. 2d 261, 266 (S.D.N.Y. 2005) (noting that plaintiff's mandamus complaint and request for preliminary injunction ignored the volume of applications pending in New York and nationwide).  The FBI processed over 3.4 million name checks in Fiscal Year 2006. <u>See</u> Cannon Decl. ¶ 21.  As of the end of Fiscal Year 2006, the FBI had over 364,600 pending name check requests, of which over 157,300 involved naturalization applications; those pending name check requests represent only a fraction of the over 1.6 million name check requests that USCIS submitted to the FBI in that fiscal year. <u>See</u> <u>id.</u> ¶ 26.  Moreover, the FBI has over 440,000 residual name checks which were among the 2.7 million name checks resubmitted to the FBI after September 11, 2001; those 440,000 name checks are still being

16

processed because the FBI's initial responses indicated that the FBI might have information relating to the applicants. See id. ¶ 24. That high volume of name check requests has placed a significant burden on the FBI's resources, and it is processing most name checks in the order in which they are received. See id. ¶ 26 (noting that the volume of name check inquiries has outpaced the FBI's resources). Once those security screenings have been completed, USCIS will schedule a naturalization interview and adjudicate Plaintiff's application. See Bijolle Decl. ¶ 8. Accordingly, this is not a case in which Defendants have refused to take any action on Plaintiff's application. Instead, any delay is attributable to the agencies' limited resources and their desire to process applications and security screenings in an orderly fashion.[2] See generally Saleh v. Ridge, 367 F. Supp. 2d 508,513 (S.D.N.Y. 2005) (concluding five-year delay in adjudicating asylum based I-485 was not unreasonable in light of the volume of applications in the system).

The complexity of the task at issue, which is another factor contributing to the FBI's backlogs, also is relevant to the rule of reason analysis. See Mashpee Wampanoag Tribal Council, Inc., 336 F.3d at 430. The FBI name check is a complex process. See Cannon Decl. ¶¶ 2-30; Eldeeb v. Chertoff, 2007 WL 2209231, at *2-*5 (M.D. Fla. July 30, 2007) (describing the steps and actions entailed in the process). It involves a check of a variety of sources, and although many name checks are resolved in a matter of days, approximately thirty two percent require additional, manual review. See id. ¶ 13. Most of those remaining checks typically are returned within three months. See id. ¶ 14. However, approximately ten percent are identified as possibly being the subject of an FBI record, and the FBI must retrieve and review the relevant

---

[2] The FBI has taken several steps to improve the name check program, including the use of contractors and hiring additional personnel. See Cannon Decl. ¶¶ 31-38.

records (many of which are in paper, and not electronic, form).  See id. ¶ 15.  Further, name

checks from applicants with "common names" typically take longer to process.  Id. ¶ 28.

Common names often have more than two hundred "hits," i.e., possible matches with a name in

an FBI record.  See Cannon Decl. ¶¶ 27-28.

  The fact that Congress stated a general belief that immigration applications should be

completed within 180 days does not change the foregoing analysis.  See Pl. MSJ at 4.  The

language Plaintiff cites expresses only "the sense of Congress that the processing of an

immigration benefit application should be completed not later than 180 days after the initial

filing of the application."  8 U.S.C. § 1571(b).  That language is precatory, and does not impose

a deadline on Defendants.  See Wright v. City of Roanoke Redevelopment and Housing, 479

U.S. 418, 432 (1987) (statute phrased in precatory terms does not create a substantive right);

Orkin v. Taylor, 487 F.3d 734, 739 (9th Cir. 2007) ("'Sense of Congress' provisions are precatory

provisions, which do not in themselves create enforceable rights, or, for that matter, any

enforceable law"). When Congress intended to set specific time limits upon an agency's

adjudication of an immigration application, it enacted language doing so.  See 8 U.S.C.

§ 1158(d)(5)(A)(iii) (requiring that asylum applications be adjudicated within 180 days after

they are filed absent"exceptional circumstances").  Notably, the INA establishes no such firm

deadline for the adjudication of a naturalization application.

  Furthermore, that "sense of Congress" provision was enacted in 2000, prior to the events

of September 11, 2001.  See Immigration Services and Infrastructures Improvements Act of

2000, Pub. L. No. 106-313, 114 Stat. 1251 (enacted Oct. 17, 2000).  Accordingly, it no longer

provides a meaningful standard against which to measure the delay at issue in this case.  The

events of September 11, 2001 marked a dramatic shift in matters involving national security, and had a significant impact on the pace and necessary thoroughness of FBI name checks and other investigations.  See Cannon Decl. ¶ 21; Razaq v. Poulos, 2007 WL 61884, at * 12 (N.D. Cal. Jan. 8, 2007) (explaining that after September 11, 2001 "there was a lot more work for the FBI to do and it had to be done a lot more carefully").

###     C.     The Impact of the Delay Is Insubstantial Compared With the National Interest in Complete and Thorough Name Checks.

The third TRAC factor, which somewhat overlaps with the fifth factor, asks whether the case is primarily about "human health and welfare" or "economic regulation."  See In re Barr Laboratories, Inc., 930 F.2d 72, 75 (D.C. Cir.), cert. denied, 502 U.S. 906 (1991).  The fifth factor addresses the nature and the extent of the interests prejudiced by the delay.  Plaintiff may be inconvenienced by the delay in adjudication of her naturalization application and completion of her name check. However, in most cases, the adverse impact caused by the delay is not substantial.  Plaintiff already is a lawful permanent resident of the United States, and alleges that she is gainfully employed.  See Pl. MSJ at 9, ¶ 21.

Turning to the fourth TRAC factor, whatever harm Plaintiff may face as a result of waiting for the results of Defendants' adjudication and investigations, those individual interests cannot outweigh Defendants' interests in fully and accurately completing each name check.  For purposes of the TRAC analysis, the relevant question is whether the importance of acting on the allegedly delayed action is outweighed by agency activities of a higher or competing priority.  Courts view this as the most important of the TRAC factors.  See Wong Sze v. INS, 1997 U.S. Dist. LEXIS 10822, *25 (N.D. CA. 1997) (citing Fraga v. Smith, 607 F. Supp. 517, 521 (D. Or. 1985)).  In this case, the competing agency priorities — namely, USCIS's duty to comply with

its regulations and the statutory provisions requiring security investigations and name checks for

all naturalization applicants,  and the FBI's interest in obtaining thorough and accurate results for

all investigations and name checks — are of  paramount importance, and cannot be sacrificed for

Plaintiff's personal desire to obtain a more swift ruling on her pending application.  See Liberty

Fund, 394 F. Supp. 2d at 118.

Security name checks for individuals seeking immigration benefits are a key component

to our nation's security.  See The 9/11 Commission Report, 2004 WL 1634382 at 352 (July 22,

2004) (finding that "had the immigration system set a higher bar for determining whether

individuals are who or what they claim to be . . . it could have potentially excluded, removed, or

come into further contact with several hijackers who did not appear to meet the terms for

admitting short-term visitors").  These checks can  reveal "derogatory information" on alien

applicants for immigration benefits.  Bijolle Decl. ¶ 5.

As the highest of priorities, "our national security requires that caution and thoroughness

in these matters not be sacrificed for the sake of expediency."  Safadi, 466 F. Supp. 2d at 701.

The FBI determined in 2002 that "deeper, more detailed clearance procedures were required to

protect the people and the interests of the United States effectively."  Cannon Decl. ¶ 23.

Moreover, the FBI has determined that it must ensure that the results of the investigatory process

are "accurate and thorough," id. ¶ 39, and that those security interests cannot yield to speed.

Likewise, Congress has mandated that name checks be completed before USCIS adjudicates a

naturalization application, and USCIS regulations require that hose name checks be complete

before the applicant is interviewed.  See 8 U.S.C. § 1446(a); 8 C.F.R.  § 335.2(b).  Although a

delay in processing may have some negative impact upon individual applicants like Plaintiff, "in

20

this post-9/11 context, agencies must have the freedom to carefully and thoroughly investigate these applications without judicial interference in their priorities." <u>Patil v. Mueller</u>, 2007 WL 1302752, at *2 (E.D. Va. Apr. 30, 2007).

> **D.    Prioritizing Plaintiff's Application and Name Check Would Simply Delay Defendants' Adjudication and Screening of Other Individuals Seeking Immigration Benefits.**

Finally, even if the <u>TRAC</u> factors favored Plaintiff, this case would not warrant judicial intervention into Defendants' processing of her naturalization application, security investigations, or name checks. <u>See</u> <u>Mashpee Wampanoag Tribal Council, Inc.</u>, 336 F.3d at 1100. As of the end of Fiscal Year 2006, there were approximately 364,600 pending USCIS name check requests, of which over 157,300 were related to naturalization applications. <u>See</u> Cannon Decl.

¶ 26. Giving Plaintiff's name check priority over those other individuals' checks would simply delay the completion of those other investigations. That would not be equitable, and

> would set a dangerous precedent, sending a clear signal that more litigious applicants are more likely to be moved to the top of the proverbial pile over other applicants that have waited even longer. Such a situation hardly optimizes resources, and serves only the individual at the detriment to the group.

<u>Dmitrenko v. Chertoff</u>, No. 07-82, 2007 WL 1303009, at * 1 (E.D. Va. Apr. 30, 2007); <u>Orlov</u>, 523 F. Supp. 2d at 36 (quoting same). Thus this is a case in which "a judicial order putting the petitioner at the head of the queue would simply move all others back one space and produce no net gain." <u>Mashpee Wampanoag Tribal Council, Inc.</u>, 336 F.3d at 1100.

Given that USCIS and the FBI are treating Plaintiff in the same manner as other applicants, and are working conscientiously to reduce the backlog, the Court should not require them to move Plaintiff ahead of other applicants awaiting name check results. <u>See</u> <u>id.</u> at 1100-

21

01; In re Barr Laboratories, Inc., 930 F.2d at 75-76 (concluding that interfering with the FDA's priorities in order to place one applicant ahead of other similarly situated applicants was inappropriate); Espin, 381 F. Supp. 2d at 266 (concluding that Plaintiff "has given no reason for the Court to compel the CIS to devote immediate attention to her adjustment application" and prioritize it over the over 250,000 applications filed in New York alone that year).  As explained supra, the volume of name checks has surpassed the FBI's resources, but the FBI is taking steps to address the delays and reduce the backlog.  See Cannon Decl. ¶¶ 31-38. Unless the applicant's name check meets the criteria for being expedited, the FBI "generally works on the oldest name checks first — a first-in, first-served protocol."  Cannon Decl. ¶ 18.  This order applies at "each stage of processing," and reflects the FBI's judgment that "all applicants are equally deserving" and should be treated fairly.  Id.

**CONCLUSION**

For the foregoing reasons, if the Court does not dismiss Plaintiff's complaint, it

should DENY Plaintiff's motion for summary judgment and GRANT Defendants' Alternative

Motion for Summary Judgment.

Dated: February 4, 2008                 Respectfully submitted,

_____
JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney

_____/s/_____
RUDOLPH CONTRERAS, D.C. BAR # 434122
Assistant United States Attorney.

_____/s/ Robin M. Meriweather_____
ROBIN M. MERIWEATHER, D.C. Bar. # 490114
Assistant United States Attorney
555 Fourth St., N.W.
Washington, D.C.  20530
Phone: (202) 514-7198
Fax: (202) 514-8780
Robin.Meriweather2@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that I caused a copy of the foregoing to be sent by the Court's

Electronic Case Filing System, this 4th day of February, 2008 to:


J. Michael Springmann PLLC
4619 Yuma Street N.W.,
Washington, D.C. 20016
springmannslaw@fcc.net


_____/s/ Robin M. Meriweather_____
ROBIN M. MERIWEATHER

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                                    )
**JELA JEVREMOVIC,**                                )
                                                    )
              **Petitioner,**                       )
                                                    )
       **v.**                                       )    **No. 1:07-CV-01278 (RMU)**
                                                    )
                                                    )
**MICHAEL CHERTOFF, Director,**                     )
**U.S. Department of Homeland Security,** *et al.*  )
                                                    )
              **Respondents.**                      )
_____)

### ORDER

       Upon consideration of Defendants' Alternative Motion for Summary Judgment, it is this _____ day of _____, 2008,

       ORDERED that Defendants' Alternative Motion for Summary Judgment be and hereby is, GRANTED;

       ORDERED that Plaintiff's Motion for Summary Judgment be and hereby is, DENIED;

       it is further ORDERED that summary judgment be and hereby is entered in favor of Defendants.

       SO ORDERED.

_____
United States District Judge

# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

Jela JEVREMOVIC,                           |

     Plaintiff,                    |

                       |     Civil Action No. 07-01278

v.                                         |

GONZALES, et al.,                          |

     Defendant(s).                 |     Declaration of
                           |     Heidi Bijolle

I, Heidi Bijolle, declare as follows:

1.     I am a Supervisory Adjudications Officer and the Naturalization Section Manager in the Vermont Service Center of U.S. Citizenship & Immigration Services (USCIS), an agency within the Department of Homeland Security. My responsibilities as the Section Chief include overseeing the adjudication of applications for naturalization.

2.     The application for naturalization (Form N-400) filed by the plaintiff, Jela Jevremovic, is pending before this office. I am aware of the facts of this case based upon my personal knowledge and review of the administrative file.

3.     USCIS records indicate that Ms. Jevremovic filed an application for naturalization on or about May 11, 2006.

4.     Ms. Jevremovic's application is currently pending the outcome of security background checks.

5.    USCIS requires that all appropriate background checks be conducted on applicants for naturalization. These checks are performed to determine whether there is any derogatory information that would make the applicant removable from the United States, ineligible for naturalization, and/or a danger to national security or public safety. The background checks are conducted by agencies outside of the control of USCIS.

6.    Background checks were initiated for Ms. Jevremovic when she filed her Form N-400, and they remain pending. Specifically, the FBI name/date of birth check was ordered on May 22, 2006 and remains pending. In addition Ms. Jevremovic was fingerprinted on or about June 28, 2006. The fingerprint check resulted in a "non-hit" and the results remain valid for 15 months.

7.    The only remaining check is the Interagency Border Inspection System (IBIS) name check. The IBIS check is performed in the District Office at the time if the naturalization interview. Results of an IBIS check are usually available immediately.

8.    Upon receipt of the FBI name/date of birth results and assuming that no adverse information is disclosed, Ms. Jevremovic will be scheduled for a naturalization interview.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 24th day of September, 2007.

Heidi Bijolle
Naturalization Section Manager

*Press Office*
**U.S. Department of Homeland Security**



# Fact Sheet

April 25, 2006

## Immigration Security Checks—How and Why the Process Works

**Background**

All applicants for a U.S. immigration benefit are subject to criminal and national security background checks to ensure they are eligible for that benefit.  U.S. Citizenship and Immigration Services (USCIS), the Federal agency that oversees immigration benefits, performs checks on every applicant, regardless of ethnicity, national origin or religion.

Since 2002, USCIS has increased the number and scope of relevant background checks, processing millions of security checks without incident.  However, in some cases, USCIS customers and immigrant advocates have expressed frustration over delays in processing applications, noting that individual customers have waited a year or longer for the completion of their adjudication pending the outcome of security checks.  While the percentage of applicants who find their cases delayed by pending background checks is relatively small, USCIS recognizes that for those affected individuals, the additional delay and uncertainty can cause great anxiety.  Although USCIS cannot guarantee the prompt resolution of every case, we can assure the public that applicants are not singled out based on race, ethnicity, religion, or national origin.

USCIS strives to balance the need for timely, fair and accurate service with the need to ensure a high level of integrity in the decision-making process.  This fact sheet outlines the framework of the immigration security check process, explaining its necessity, as well as factors contributing to delays in resolving pending cases.

**Why USCIS Conducts Security Checks**

USCIS conducts security checks for all cases involving a petition or application for an immigration service or benefit.  This is done both to enhance national security and ensure the integrity of the immigration process.  USCIS is responsible for ensuring that our immigration system is not used as a vehicle to harm our nation or its citizens by screening out people who seek immigration benefits improperly or fraudulently.  These security checks have yielded information about applicants involved in violent crimes, sex crimes, crimes against children, drug trafficking and individuals with known links to terrorism.  These investigations require time, resources, and patience and USCIS recognizes that the process is slower for some customers than they would like.  Because of that, USCIS is working closely with the FBI and other agencies to speed the background check process.  However, USCIS will never grant an immigration service or benefit before the required security checks are completed regardless of how long those checks take.

**How Immigration Security Checks Work**

To ensure that immigration benefits are given only to eligible applicants, USCIS adopted background security check procedures that address a wide range of possible risk factors. Different kinds of applications undergo different levels of scrutiny. USCIS normally uses the following three background check mechanisms but maintains the authority to conduct other background investigations as necessary:

- **The Interagency Border Inspection System (IBIS) Name Check—** IBIS is a multiagency effort with a central system that combines information from multiple agencies, databases and system interfaces to compile data relating to national security risks, public safety issues and other law enforcement concerns. USCIS can quickly check information from these multiple government agencies to determine if the information in the system affects the adjudication of the case. Results of an IBIS check are usually available immediately. In some cases, information found during an IBIS check will require further investigation. The IBIS check is not deemed completed until all eligibility issues arising from the initial system response are resolved.

- **FBI Fingerprint Check—**FBI fingerprint checks are conducted for many applications. The FBI fingerprint check provides information relating to criminal background within the United States. Generally, the FBI forwards responses to USCIS within 24-48 hours. If there is a record match, the FBI forwards an electronic copy of the criminal history (RAP sheet) to USCIS. At that point, a USCIS adjudicator reviews the information to determine what effect it may have on eligibility for the benefit. Although the vast majority of inquiries yield no record or match, about 10 percent do uncover criminal history (including immigration violations). In cases involving arrests or charges without disposition, USCIS requires the applicant to provide court certified evidence of the disposition. Customers with prior arrests should provide complete information and certified disposition records at the time of filing to avoid adjudication delays or denial resulting from misrepresentation about criminal history. Even expunged or vacated convictions must be reported for immigration purposes.

- **FBI Name Checks—**FBI name checks are also required for many applications. The FBI name check is totally different from the FBI fingerprint check. The records maintained in the FBI name check process consist of administrative, applicant, criminal, personnel and other files compiled by law enforcement. Initial responses to this check generally take about two weeks. In about 80 percent of the cases, no match is found. Of the remaining 20 percent, most are resolved within six months. Less than one percent of cases subject to an FBI name check remain pending longer than six months. Some of these cases involve complex, highly sensitive information and cannot be resolved quickly. Even after FBI has provided an initial response to USCIS concerning a match, the name check is not complete until full information is obtained and eligibility issues arising from it are resolved.

For most applicants, the process outlined above allows USCIS to quickly determine if there are criminal or security related issues in the applicant's background that affect eligibility for immigration benefits. Most cases proceed forward without incident. However, due to both the sheer volume of security checks USCIS conducts, and the need to ensure that each applicant is thoroughly screened, some delays on individual applications are inevitable. Background checks may still be considered pending when either the FBI or relevant agency has not provided the final response to the background check or when the FBI or agency has provided a response, but the response requires further investigation or review by the agency or USCIS. Resolving pending cases is time-consuming and labor-intensive; some cases legitimately take months or even

**Immigration Security Checks—How and Why the Process Works**

several years to resolve.  Every USCIS District Office performs regular reviews of the pending caseload to determine when cases have cleared and are ready to be decided.  USCIS does not share information about the records match or the nature or status of any investigation with applicants or their representatives.

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

JELA JEVREMOVIC )
)
)
Plaintiff, )
)
v. )      Case No:
)      1:07-CV-01278
MICHAEL CHERTOFF, et al. )
)
Defendants. )
)

## DECLARATION OF MICHAEL A. CANNON

Michael A. Cannon, pursuant to 28 U.S.C. § 1746, declares the following:

(1)     I am currently the Section Chief of the National Name Check Program Section ("NNCPS") at the Headquarters of the Federal Bureau of Investigation ("FBI") in Washington, D.C. I have held that position since March 7, 2005.

(2)     In my current capacity as Section Chief, I supervise the National Name Check Units. The statements contained in this declaration are based upon my personal knowledge, upon information provided to me in my official capacity, and upon conclusions and determinations reached and made in accordance therewith.

(3)     Due to the nature of my official duties, I am familiar with the procedures followed by the FBI in responding to requests for information from its files pursuant to the policy and the procedures of the United States Citizenship and Immigration Services ("USCIS"). Specifically, I am aware of the name check request for Jela Jevremovic, the plaintiff in this civil action.

## NATIONAL NAME CHECK PROGRAM

(4)  The National Name Check Program ("Program") has the mission of disseminating information from the FBI's Central Records System in response to requests submitted by federal agencies, congressional committees, the federal judiciary, friendly foreign police and intelligence agencies, and state and local criminal justice agencies. The Central Records System ("CRS") contains the FBI's administrative, personnel, and investigative files. The Program has its genesis in Executive Order No. 10450, issued during the Eisenhower Administration. That executive order addresses personnel security issues and mandates National Agency Checks as part of the pre-employment vetting and background investigation process for prospective Government employees. The FBI performs the primary National Agency Check conducted on all United States Government employees. From this modest beginning, the Program has grown exponentially, with more and more customers seeking background information from FBI files on individuals before bestowing a privilege, such as Government employment or an appointment, a security clearance, attendance at a White House function, a "green card" or naturalization, admission to the bar, or a visa. More than 70 federal, state, and local agencies regularly request FBI name searches. In addition to serving our regular Government customers, the FBI conducts numerous name searches in direct support of the FBI's counterintelligence, counterterrorism, and homeland security efforts.

## EXPLANATION OF THE CENTRAL RECORDS SYSTEM

(5)  The FBI's CRS enables the FBI to maintain all information which it has acquired in the course of fulfilling mandated law enforcement responsibilities. The records maintained in the CRS consist of administrative, applicant, criminal, personnel, and other files

2

compiled for law enforcement purposes. This system consists of a numerical sequence of files broken down according to subject matter. The subject matter of a file may relate to an individual, organization, company, publication, activity, or foreign intelligence matter. Certain records in the system are maintained at FBI Headquarters. Records which are pertinent to specific FBI Field Offices are mostly maintained at those Field Offices.

(6)     FBI Headquarters and each Field Division can access the CRS through the FBI's General Indices. The General Indices are arranged in alphabetical order and consist of indices on various subjects, including the names of individuals and organizations. Only the information considered pertinent, relevant, or essential for future retrieval is indexed.

(7)     Communications directed to FBI Headquarters from various Field Offices and Legal Attaches are filed in the pertinent case files and indexed to the names of individuals, groups, or organizations which are listed in the case captions or titles as subjects, suspects, or victims. Searches made in the index to locate records concerning particular subjects are made by searching the name of the subject requested in the index.

(8)     The entries in the General Indices fall into two categories:

    (a)     "main" entries – entries that carry the name corresponding with the subject of a file contained in the CRS.

    (b)     "reference" entries – entries (sometimes called "cross-references") that generally only mention or reference an individual, organization, etc., that is contained in a document located in another "main" file.

(9)     In 1995, the FBI implemented the Automated Case Support ("ACS") system for its Headquarters, Field Offices, and Legal Attaches. More than 105 million records were converted from automated systems previously utilized by the FBI. The ACS system

3

consists of the following three automated applications that support case management functions

for all investigative and administrative cases:

    (a)    Investigative Case Management:  This application provides the ability to open, assign, and close investigative and administrative cases as well as to set, assign, and track leads.  A case is opened by the Office of Origin, which sets leads for itself and other field offices, as needed.  The offices that receive the leads are referred to as Lead Offices. When a case is opened, it is assigned a Universal Case File Number, which is utilized by FBI Headquarters and all offices conducting or assisting in the investigation.  Using fictitious file number "111-HQ-12345" as an example, an explanation of the Universal Case File Number is as follows: "111" indicates the classification for that specific type of investigation; "HQ" is the abbreviated form used for the Office of Origin of the investigation (in this case, FBI Headquarters); and "12345" indicates the individual case file number for that particular investigation.

    (b)    Electronic Case File:  This application serves as the central electronic repository for the FBI's official text-based documents.  It supports the universal serial concept, where only the creator of a document serializes it into a file, providing single source entry of serials into the computerized system.  All serials originated by the Office of Origin are maintained in the Office of Origin's case file.

    (c)    Universal Index:  This application, sometimes referred to as "UNI", continues the universal concepts of the ACS system by providing a complete subject/case index to all investigative and administrative cases.  Only the Office of Origin is required to index.  However, the Lead Offices may index additional information as needed.  The Universal Index, which consists of an index of approximately 99.6 million records, functions to index names to cases, and to search names and cases for use in the FBI investigative and administrative cases.  Names of individuals or entities are recorded with identifying information such as the date or place of birth, race, sex, locality, social security number, address, or date of event.

(10)    The decision to index names other than subjects, suspects, and victims is a discretionary decision made by the investigative FBI Special Agent, the supervisor in the field division conducting the investigation, and the supervising FBI Special Agent at FBI Headquarters. The FBI does not index every name in its files, but indexes only that information considered pertinent, relevant, or essential for future retrieval. Without a "key" (index) to this mass information, information essential to ongoing investigations could not be readily retrieved. The FBI files would thus be merely archival in nature and could not be effectively used to serve one of the mandated missions of the FBI, to investigate violations of federal criminal statutes. Therefore, the General Indices to the CRS files are the means by which the FBI can determine what retrievable information, if any, the FBI may have in its CRS files on a particular subject matter.

(11)    When the FBI searches a person's name, the name is electronically checked against the FBI's Universal Index. The searches seek all instances of the individual's name, social security number, and dates close to his or her date of birth, whether a main file or reference. As previously stated, any "main" file name would be that of an individual who is, himself or herself, the subject of an FBI investigation, whereas any "reference" would be an individual whose name appears as part of an FBI investigation. For example, "references" include associates, witnesses, or conspirators. Additionally, there may be a myriad of other reasons to explain why an FBI Special Agent conducting an investigation believed it important to include a particular name in the FBI's index for later recovery. The names are searched in a multitude of combinations, switching the order of first, last, and middle names, as well as combinations with only the first and last names, first and middle names, and so on. The Program

5

application searches names phonetically against the Universal Index records and retrieves similar spelling variations (which is especially important considering that many names in our indices have been transliterated from a language other than English).

(12)   If there is a match with a name in a FBI record, it is designated as a "Hit," meaning that the system has stopped on a possible match with the name being checked. If a search comes up with a match to a name and either a close date of birth or social security number, it is designated an "Ident."

## RESOLUTION RATE

(13)   There are four stages involved in the completion of an individual name check: batch processing, name searching, file review, and dissemination. The first stage in the process, batch processing, involves the transfer of the name check requests from USCIS to the NNCPS on magnetic tapes. Each tape can hold up to 10,000 names. (Some requests are transmitted via facsimile or verbally via telephone.) The tapes are uploaded into an FBI system and the names are electronically checked against the FBI's Universal Index (UNI). Historically, during the batch processing phase, approximately 68 percent of the name checks submitted by USCIS are returned to USCIS as having "No Record" within 48-72 hours. A "No Record" indicates that the FBI's Universal Index database contains no identifiable information regarding a particular individual. Duplicate submissions (i.e., identically spelled names with identical dates of birth and other identical information submitted while the original submission is still pending) are not checked, and the duplicate findings are returned to USCIS within 48-72 hours.

(14)   The second stage in the process is name searching. For the name check requests that are still pending after the initial electronic check, additional review is required. An

6

FBI employee in the NNCPS physically enters the applicant's name into the computer database searching different fields and information. A secondary manual name search completed typically within 30-60 days historically identifies an additional 22 percent of the USCIS requests as having "No Record," for a 90 percent overall "No Record" response rate. The results of this 22 percent also are returned to USCIS.

(15)    The third and fourth stages in the process are file review and dissemination. The remaining 10 percent are identified as possibly being the subject of an FBI record. At that point, the FBI record must be retrieved and reviewed. If the record was electronically uploaded into the FBI's ACS electronic record-keeping system, it can be reviewed quickly. If not, however, the relevant information must be retrieved from an existing paper record. Review of this information will determine whether the information is identified with the request. If the information is not identified with the request, the request is closed as a "No Record" and USCIS is so notified.

(16)    Additional searches against the FBI's Universal Index, additional manual name searches, and/or additional file review of a name check request, depending on the length of time a name check request is pending in the processing queue, may occur periodically during the name check process to ensure that stale information is updated.

(17)    Once a record is retrieved, the FBI reviews the file for possible derogatory information. Less than one percent of USCIS's requests are identified with a file containing possible derogatory information. If appropriate, the FBI forwards a summary of the derogatory information to USCIS.

7

(18)     At each stage of processing, the NNCPS generally works on the oldest

name checks first – a first-in, first-served protocol. This protocol reflects that all applicants are

equally deserving and ensures that all applicants are treated fairly. However, if an applicant's

name check requires a review of numerous FBI records and files, even though that person came

in first, the name check may require additional time until all responsive records are located and

reviewed.

(19)     The general exception to the first-in, first-served policy exists when

USCIS directs that a name check be handled on an "expedited" basis. USCIS determines which

name checks are to be expedited based on criteria it determines. Once designated as an

"expedite," that name check proceeds to the front of the queue along with other prioritized name

check requests, in front of the others waiting to be processed.

(20)     Another exception to the first-in, first-served policy is a near-term effort

agreed to by USCIS and the FBI to reduce the number of pending USCIS name check requests by

prioritizing "single hit" name checks. This key initiative is explained in paragraph (33) below.

## GROWTH OF THE NAME CHECK PROGRAM

(21)     Prior to September 11, 2001, the FBI processed approximately 2.5 million

name check requests per year. As a result of the FBI's post-9/11 counterterrorism efforts, the

number of FBI name checks has grown. For fiscal year 2006, the FBI processed in excess of 3.4

million name checks.

(22)     A significant portion of the incoming name checks submitted over the past

few years has been submitted by USCIS. In fiscal year 2003, 64% (approximately 3,929,000) of

the total incoming name checks were submitted by USCIS; in fiscal year 2004, 46% (~1,727,000)

8

of the total incoming name checks were submitted by USCIS; in fiscal year 2005, 45%

(~1,512,000) of the total incoming name checks were submitted by USCIS; and in fiscal year

2006, 45% (~1,633,000) of the total incoming name checks were submitted by USCIS.

## USCIS NAME CHECK REQUESTS

(23)     In November 2002, heightened national security concerns prompted a

review of the former Immigration and Naturalization Service's ("INS's") procedures for

investigating the backgrounds of individuals seeking immigration benefits. It was determined

that deeper, more detailed clearance procedures were required to protect the people and the

interests of the United States effectively. One of the procedures identified was the FBI's name

check clearance. Before November 2002, only those "main" files that could be positively

identified with an individual were considered responsive to the immigration authorities name

check requests. However, because that approach ran a risk of missing a match to a possible

derogatory record, the FBI altered its search criteria to include "reference" files as well. From a

processing standpoint, this meant the FBI was required to review many more files in response to

each individual background check request.

(24)     In December of 2002 and January of 2003, the former INS resubmitted 2.7

million name check requests to the FBI for background investigations of all individuals with

then-pending applications for immigrations benefits for which the Immigration and Nationality

Act required background investigations. Those 2.7 million requests were in addition to the

regular submissions by the former INS. Currently, the FBI has returned an initial response to all

2.7 million resubmitted requests. Moreover, although many of the FBI's initial responses to

those resubmitted requests indicated that the FBI had no information relating to the specific

9

individual who was the subject of the request, approximately 16 percent – or over 440,000 – resubmitted requests indicated that the FBI may have information relating to the subject of the inquiry. The FBI is still in the process of resolving those 440,000 requests. Currently, less than 6,300 of those resubmitted requests remain pending.

(25)    The FBI's processing of the more than 440,000 residuals has delayed the processing of regular submissions from USCIS. A dedicated team within NNCPS has been assigned to handle only these re-submitted name check requests. To the extent that the team members are working on only these applications, they are unavailable to process the normal submissions.

(26)    There are numerous factors that have contributed to delays in the processing of name check requests. One is the volume of incoming name checks – the total volume of incoming name check requests combined with pending name check requests has historically outpaced the NNCPS's available resources to process this volume. As it concerns submissions by USCIS, for Fiscal Year 2006, USCIS submitted approximately 1,633,000 name check requests, of which approximately 718,000 represented naturalization-related name checks and approximately 658,000 represented adjustment of status-related name checks. As of the end of Fiscal Year 2006, the NNCPS had over 364,600 pending USCIS name check requests, of which over 157,300 represented naturalization-related name checks and over 157,800 represented adjustment of status-related name checks.

(27)    The number of "hits" on a name when it is reviewed may further contribute to a delay in processing a name check request. A "hit" is a possible match with a

10

name in an FBI record. The number of times the name appears in FBI records correlates to the number of records which require review.

(28)     The processing of common names also contributes to a delay in processing a name check request. The names associated with a name check request are searched in a multitude of combinations, switching the order of first, last, and middle names, as well as combinations with just the first and last, first and middle, and so on. Without detailed information in both the file and agency submission, it is difficult to determine whether or not a person with a common name is the same person mentioned in FBI records. Common names can often have more than 200 hits on FBI records.

(29)     The accessibility of the FBI record needed for review also contributes to a delay in processing a name check request. If the date of the record predates October 1995, the paper record has to be located, retrieved, and reviewed; if the date of the record is later than October 1995, the record text may or may not be available electronically depending on the type of record and whether it has been uploaded electronically. A paper record could be at one of over 265 possible locations across the country. Requests often involve coordinating the retrieval and review of files from the various 56 different FBI field offices. One person's name check may involve locating and reviewing numerous files, all at different physical locations. Each request must be communicated internally from the NNCPS to the field, and handled according to the current priorities of the particular field office. Since it is a paper based process, it is a process subject to misplaced or misfiled files. The process is time consuming and labor intensive.

(30)    Another contributing factor which was briefly mentioned earlier in this declaration is the expedited request.  Processing an expedited case means that an employee is not available to work on a normal name check request.

## THE NATIONAL NAME CHECK PROGRAM IS ADDRESSING THE FACTORS THAT CONTRIBUTE TO DELAYS IN PROCESSING A NAME CHECK

(31)    The FBI is seeking a number of improvements to its process.  Over the short-term:

(32)    NNCPS is continuing to develop the Name Check Dissemination Database ("NCDD"), an electronic repository for name check results, to eliminate manual and duplicate preparation of reports to other Agencies, and provide avenues for future automation of the name check process.

(33)    NNCPS is partnering with other Agencies to provide contractors and personnel to process name checks.  For example, the FBI and USCIS have implemented a key initiative to use contractor resources to prioritize the processing of "Single-Hit" USCIS Name Check requests, that is, pending name check requests that have only one FBI file potentially identified with it that needs to be reviewed in order to process the request.  By applying contractor resources to process these "Single Hit" requests, the FBI may significantly reduce the pending USCIS name check workload.

(34)    The FBI is in the process of hiring additional employees to fill current vacancies and has procured an employee development program to streamline the training of new employees, thereby significantly decreasing the amount of time needed before a new employee

12

can begin to significantly impact the NNCPS workload. These efforts have led to the development of a name check employee training manual.

(35)    NNCPS, through the Records Management Division's Records Automation Section, is scanning the paper files required for review in order to provide machine readable documents for the Dissemination Database. It is also building an Electronic Records System that allows for future automation of the name check process.

(36)    NNCPS is working with customers to streamline incoming product and to automate exchange of information.

(37)    As a mid-term improvement, NNCPS is exploring technology updates to the name check process. Specifically, the FBI procured textual analysis software in order to investigate ways to further automate the name check process. The goal is to incorporate analytical software applications that reduce the time spent to verify the identity of the individual and, once verified, assists in the adjudication analysis. This type of automation should decrease the time required to process a name check, thereby increasing production. The FBI is building a proof of concept system for eventual integration into the FBI's core databases.

(38)    As a long-term improvement, the FBI is developing a Central Records Complex that will create a central repository of records. Currently, paper files/information must be retrieved from over 265 locations throughout the FBI. The Central Records Complex will address this issue, creating a central repository-scanning of documents, and expediting access to information contained in billions of documents that are currently manually accessed in locations around the United States and world. In addition, the essential long term improvement for FBI Name Checks is to adjust the fee schedule to reflect the actual cost of providing name check

13

services. Once in place, the FBI will be able to scale resources proportionally with workload

demands – pending name checks will pay for themselves. At this time fees do not cover the

basic costs of providing the service. Therefore, the FBI cannot adequately apply resources to

processing name checks without pulling critically needed personnel and funding from other

programs. The FBI procured services to conduct a study to determine an appropriate fee

structure. The independent contractor hired to conduct the study has completed its work and the

proposed fee structure is undergoing the Federal rulemaking process.

(39)     For the reasons stated earlier, the FBI cannot provide a specific or general

time frame for completing any particular name check submitted by USCIS. The processing of

name checks, including those which are expedited at the request of USCIS, depends upon a

number of factors, including where in the processing queue the name check lies; the workload of

the analyst processing the name check; the volume of expedited name checks the analyst must

process for, among others, military deployment, "age-outs," sunset provisions such as Diversity

Visa cases, compelling reasons such as critical medical conditions, and loss of Social Security or

other subsistence; the number of "Hits," (i.e., possible matches) that must be retrieved, reviewed

and resolved; the number of records from various Field Offices that must be retrieved, reviewed

and resolved; and, more generally, the staff and resources available to conduct the checks.

Unfortunately, the proprietary software NNCPS utilizes to process name checks does not report

where in the processing queue a particular name check request may lie vis-à-vis other name

checks. Additionally, until review of each case is undertaken no estimate for the time required to

complete it can even be attempted, no estimate can be made as to when the plaintiffs' cases will

be reached by NNCPS staff, nor can any reliable estimate be made as to how long it will take to

14

complete the review once it has begun. While the FBI is sensitive to the impact of the delays in processing name check requests, the consequence of the FBI's mission on homeland security requires that its name check process be primarily focused on providing accurate and thorough results. When the name check is completed, the FBI provides the results to USCIS as quickly as possible.

(40)    It is important to note that the FBI does not adjudicate applications for benefits under the Immigration and Nationality Act. If appropriate, the FBI generally provides a summary of available information to USCIS for its adjudication process.

## PLAINTIFF'S NAME CHECK REQUEST

(41)    The name check request for plaintiff Jela Jevremovic was received by the FBI from USCIS on or about May 26, 2006 and has not been completed. The FBI is performing its check in response to USCIS's request in accordance with the procedures outlined above. The results of the name check will be forwarded to USCIS in Washington, D.C., in due course, in accordance with the FBI's normal protocol.

(42)    Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this _5__ day of October 2007.


MICHAEL A. CANNON
Section Chief
National Name Check Program Section
Records Management Division
Federal Bureau of Investigation
Washington, D.C.

15